**WANTANABE REALTY CORPORATION, et al., Plaintiffs,**

v.

**THE CITY OF NEW YORK, et al., Defendants.**

**No. 01 CIV.10137 LAK.**

United States District Court, S.D. New York.

July 10, 2003.

As Corrected July 14, 2003.

Barry S. Gedan, for Plaintiffs.

Gabriel Taussig, Robin Binder, Kerri A. Devine, Rachel Goldman, Michael A. Cardozo, Corporation Counsel of the City of New York, New York City, for Municipal Defendants.

Michael S. Seltzer, The Law Office of Vincent D. McNamara, for Defendants N.B.I. Equipment Corp. and Anthony Noto.

## OPINION

KAPLAN, District Judge.

Plaintiffs, one of which owned the long idle Thunderbolt roller coaster[1] at Coney Island, here contend that former Mayor Rudolph Giuliani caused the City of New York to tear down the Thunderbolt without affording plaintiffs notice or an oppor-

---

1. The roller coaster had been inactive since approximately 1983. Cpt. ¶ 40.

tunity to be heard. He allegedly did so out of racial animus, to retaliate for a prior lawsuit against the City, and to accommodate the owners of the New York Mets. Discovery having been completed, the matter is before the Court on the defendants' motions for summary judgment dismissing the complaint.

I

### A. Parties

Plaintiffs are Wantanabe Realty Corp. ("Wantanabe"), Coney Island Resorts, Inc. ("CIR"), and Horace Bullard. Bullard allegedly is the principal owner of CIR and, through a nominee, the owner of Wantanabe.[2] He is half black and half Puerto Rican.[3]

The defendants are the City of New York, former Mayor Giuliani, ten officials of the City Departments of Buildings ("DOB") and of Housing, Preservation and Development ("HPD"), N.B.I. Equipment Corp. ("NBI"), and NBI's president, Anthony Noto. NBI was the contractor that demolished the Thunderbolt pursuant to a contract with the City.

### B. The Complaint

#### 1. Background

Bullard at some point in the past planned to develop an amusement/entertainment/commercial project in Coney Island. CIR was the intended developer, and Bullard, CIR and Wantanabe worked together to create a real estate assemblage for the project.[4] In the course of doing so,

Wantanabe acquired ownership of property that included Block 7074, Lot 105, on the Kings County tax map, which contained the Thunderbolt and a building beneath it.[5]

Bullard's project required the use not only of the property owned by Wantanabe, but of certain adjacent property owned by the City.[6] The complaint alleges that CIR entered into a binding contract with the City pursuant to which title to the entire area would have been vested in the City, subject to a ninety-nine year lease back to CIR. Plaintiffs assert that the City repudiated the deal during the Giuliani administration and decided to build a minor league stadium, Keyspan Park, for the New York Mets on the City-owned portion of the property.[7] Litigation ensued and was unresolved when this action was filed. Subsequently, however, the Second Circuit affirmed Judge Glasser's decision, which granted summary judgment dismissing the case, holding among other things that the City's obligation to enter into the lease had been contingent upon CIR obtaining financing for the project and that CIR had failed to do so.[8]

#### 2. The Alleged Plan

In any case, while the litigation was pending, the City built the stadium, now Keyspan Park. The complaint alleges that Fred Wilpon, the owner of the Mets, and his son complained to then Mayor Giuliani that the Thunderbolt was an "eyesore" that would command the view of patrons attending games at the stadium. The Mayor was disturbed and wanted to satisfy

---

**2.** *Id.* ¶¶ 24–25.

**3.** Bullard Dep. 204.

**4.** Cpt. ¶¶ 23, 25.

**5.** *Id.* ¶¶ 27–29.

**6.** *Id.* ¶ 31.

**7.** *Id.* ¶¶ 32–39.

**8.** *Coney Island Resorts, Inc. v. Giuliani,* 11 Fed.Appx. 11 (2d Cir.), *cert. denied,* 534 U.S. 1054, 122 S.Ct. 644, 151 L.Ed.2d 562 (2001), *aff'g* 103 F.Supp.2d 645 (E.D.N.Y.2000).

the Wilpons.[9] Based on this desire, as well as an allegedly "strong personal animus" toward Bullard based both on his race and his having named the mayor as a defendant in the litigation concerning the development project, Giuliani is said to have "put in motion a plan . . . to destroy and remove" the Thunderbolt.[10]

In order to carry out the plan, the Mayor is alleged to have "conveyed . . . his desire that the Thunderbolt . . . be declared unsafe and removed in such a manner as to prevent the owner . . . from exercising its legal remedies to forestall such removal."[11] This is said to have been the impetus for the City's demolition of the roller coaster in November 2000 without any prior notice to plaintiffs.[12]

## C. The Legal Context

Before turning to the evidence, it is helpful to set out the legal context with respect to demolition of unsafe buildings in New York City.

In general, "[a] municipality may demolish a building without providing notice and an opportunity to be heard if there are exigent circumstances which require immediate demolition of the building to protect the public from imminent danger."[13] In other circumstances, however, such summary action is inappropriate.

Article 8 of the New York City Administrative Code[14] sets out procedures for removing or repairing hazardous structures (the "Unsafe Building Procedure" or "UBP"). In brief summary, the Unsafe Building Procedure contemplates the following steps:

1. Upon receipt of a report from a DOB employee that a structure is unsafe or dangerous, the borough superintendent shall cause the report to be docketed in the department's records. Notice shall be served on the owner with a description of the dangerous condition and an order that the structure be made safe or removed.[15]

2. Should the superintendent determine that there is "actual and imminent danger" that a structure may fall, he or she "shall . . . cause the necessary work to be done to render such structure . . . temporarily safe until the proper proceedings provided for unsafe structures by this subchapter are instituted."[16]

3. If the owner indicates that it will comply with the superintendent's order, it must begin work within twenty-

---

9. Cpt. ¶¶ 39–41, 52.

10. *Id.* ¶¶ 42–44, 52.

11. *Id.* ¶ 45.

12. *Id.* ¶¶ 52–103.

13. *Calamusa v. Town of Brookhaven*, 272 A.D.2d 426, 427, 708 N.Y.S.2d 317 (2d Dept. 2000) (citing cases); *accord* 7A EUGENE McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 24.561, at 182–83 (3d ed.1998); *see Home Doc Corp. v. City of New York*, 297 A.D.2d 277, 278, 746 N.Y.S.2d 42, 43 (2d Dept.2002); *see also* N.Y.C. AD. C. § 26–127a. ("[A]ny building . . . in a condition or in effect dangerous or detrimental to life or property . . . is a public nuisance. . . . The commissioner [of buildings] is empowered to abate any such public nuisance.").

14. N.Y.C. AD. C. §§ 26–235 to 26–243 (1992 & Supp. second half 2001).

15. *Id.* § 26–236a.
The notice must inform the owner also that failure to comply will result in a survey of the property followed by the commencement of court proceedings seeking a court order requiring repair or demolition of the premises. *Id.*

16. *Id.* § 26–243b.

four hours.[17] If the owner fails to comply with the order, the premises are surveyed and the report placed before the state supreme court for a determination whether the structure is unsafe or dangerous and "whether the unsafe or dangerous structure or premises shall be vacated and repaired and secured, or repaired and secured, or taken down and removed . . . ."[18]

4. If the court determines that the building is unsafe or dangerous, it shall issue a "precept" reciting the verdict and commanding the borough superintendent to repair or take down the structure.[19]

While the UBP does not specifically authorize the City to demolish a building without obtaining a precept from the supreme court, even in the event of an imminent threat to life or safety,[20] the City's position is that it may do so. DOB Operations Policy and Procedure Notice # 16/93 (the "OPPN") creates a two-tiered procedure for demolition of dangerous structures:

● Where a building has suffered "life threatening structural damage" or is "in imminent danger of collapse," the DOB may issue a so-called Immediate Emergency Declaration pursuant to which it expects work to "begin by the day after the declaration."[21]

● Where a building has "serious structural damage" or is in "a deteriorating condition when a collapse or failure is expected in the very near future," the DOB may issue an Emergency Declaration pursuant to which it expects work to begin within thirty to sixty days. In such cases, however, an unsafe building violation is written.[22]

When the DOB proceeds under the OPPN, it does not commence a UBP proceeding or seek a precept.[23] It does, however, send a notice to the owner.

**D. Legal Theories**

The complaint asserts nine claims for relief:

● The first asserts that the demolition without following the Unsafe Building Procedure deprived Wantanabe of its right to procedural due process in violation of the Fourteenth Amendment.

● The second maintains that the demolition in the manner alleged in the complaint was "so arbitrary, conscience-

17. *Id.* § 26–237.

18. *Id.* §§ 26–236a, 26–239.

19. *Id.* § 26–239d.

20. As noted, the Commissioner of Buildings is empowered elsewhere in the Administrative Code to abate any building "dangerous or detrimental to life or property" as a "public nuisance." *Id.* § 26–127a. There appears to be no New York authority on the question whether this provision authorizes summary action consistent with the common law rule or contemplates simply that the Commissioner in such a case may resort to the UBP. That issue is not material to this motion.

21. Devine Decl. (Docket Item ["DI"] 46) Ex. B.

The OPPN quoted in the text was preceded by at least one earlier version. Exhibits to Plaintiffs' Motion for Summary Judgment (DI 41) (hereinafter "PX") 25. The Court perceives no material differences.

22. Devine Decl. (DI 46) Ex. B at 2.

23. Plaintiffs admit "that, as stated in the City defendants' brief, the City, as a matter of *de facto* policy, practice and procedure, regularly carries out non-immediate 'Emergency' demolitions without following the U.B. procedure and without a Precept." Pl. Mem. Opp'n 30; *see also, e.g.,* Pl. Mov. 56.1 St. (DI 43) ¶¶ 48, 58; Pl. Opp'n 56.1 St. (DI 55) ¶ 41; Zeid Dep. 141–50.

shocking, and oppressive" as to deprive Wantanabe of its right to substantive due process under the Fourteenth Amendment.

● The third contends that the defendants, by failing to resort to the Unsafe Building Procedure, intentionally treated Wantanabe "differently from all others similarly situated" without any rational basis. It further alleges that former Mayor Giuliani was motivated by animus against Bullard based on his race and the other circumstances alleged. Accordingly, it maintains that the defendants deprived Wantanabe of the equal protection of the laws in violation of the Fourteenth Amendment.

● The fourth asserts that defendants conspired to enter upon Wantanabe's property for the purpose of depriving it of the equal protection of the laws out of racial animus and thereby violated 42 U.S.C. § 1985(3).

● The fifth alleges that all of the defendants were aware of the Unsafe Building Procedure and of the conspiracy to deprive Wantanabe of its rights, yet failed to prevent one another from so acting, allegedly in violation of 42 U.S.C. § 1986.

● The sixth claim asserts that the defendants acted in part out of a desire to retaliate against plaintiffs for the prior federal lawsuit and thereby violated 42 U.S.C. § 1985(2).

● The seventh contends that the demolition was an uncompensated taking of property of Wantanabe in violation of the Fourteenth Amendment.

● The eighth asserts that defendants violated Wantanabe's rights under Article I, §§ 6, 7(a), and 11 of the New York Constitution, which parallel the Due Process, Equal Protection, and "Takings" Clauses of the U.S. Constitution.

● The ninth seeks relief on behalf of Wantanabe on the theory of common law trespass.[24]

The first seven claims all rest on 42 U.S.C. § 1983.

### E. The Evidence

#### 1. Initial City Hall Involvement

Former Mayor Giuliani had at least one conversation with either Fred Wilpon, the owner of the New York Mets, or his son in which either the elder or younger Wilpon said that the roller coaster was an eyesore, that it looked dangerous, and that children would be in the area once the stadium was built.[25]

Mayor Giuliani held daily morning meetings during his administration at which up to twenty different issues were discussed on any given day.[26] He acknowledged at his deposition that the Thunderbolt was mentioned "in the context of talking about the baseball stadium," either in these meetings or on another occasion.[27]

Michael Carey, then president of the Economic Development Corporation ("EDC"), the agency responsible for the stadium project, was more specific about one such meeting. He testified that he was present on an occasion during the summer or fall of 2000 when the Mayor inquired how the stadium project was going and asked also what else the City was "doing out there,"[28] evidently a reference

---

24. By prior order, the Court has dismissed the ninth claim for relief as to NBI and Noto. Order. Dec. 19, 2002.

25. Giuliani Dep. 11–12.

26. *Id.* 115–16.

27. *Id.* 7–8, 26, 31–32, 37–38.

28. Carey Dep. 47–49, 56.

to Coney Island redevelopment. Bullard's name came up as a property owner in the area. In the course of a discussion about whether the City could work with Bullard, Jeffrey Hess, a senior advisor to the Mayor, said that the City had tried to work with Bullard before, that Bullard had been "dedesignated," and that he showed no indication of financial viability or a successful track record.[29] Carey told the group that Bullard "had not performed" and that Carey "would be very, very leery of signing up with him as opposed to looking for other opportunities for development at Coney Island and with people that probably had a better track record."[30]

The subject of a lawsuit by Bullard came up as well.[31] One or more of those present reported that Bullard had made ad hominem attacks in the lawsuit, accusing Jeffrey Hess and other members of the Giuliani administration "of being ... dishonest ... [and] deceitful" and the Mayor and his administration of being "[r]acially prejudiced."[32] Jeffrey Hess, Michael Hess (then Corporation Counsel), and probably Denny Young expressed disappointment, chagrin and perhaps anger at the accusations.[33] There is no evidence, however, that the Mayor expressed any views concerning the accusations.[34] Carey stated, moreover, that there was no discussion at the meeting about "taking any action with respect to the Thunderbolt."[35]

Deputy Mayor Robert M. Harding, who was at the meeting described by Carey,[36] was among the people with whom Giuliani discussed the Thunderbolt.[37] He testified that he had become aware of concern about the condition of the roller coaster and saw it in the spring or early summer of 2000 on the day on which ground was broken for the stadium.[38]

Melvin Glickman, an executive vice president of the EDC, testified that someone told him of a concern regarding the condition and structural safety of the Thunderbolt and that he called Barry Cox, deputy commissioner of the DOB for operations and administration, to request an inspection.[39] Cox in turn called Frank Marchiano, the assistant commissioner for DOB operations, and Tarek Zeid, DOB's Brooklyn borough commissioner/superintendent, and asked that the Thunderbolt be inspected.[40] Marchiano then called either Joseph Mineo, acting executive chief inspector at DOB, or Zeid, and asked that an inspector look at the structural integrity of the roller coaster.[41]

### 2. The Inspection

Zeid assigned Schoefield Padmore, a building inspector, and Edward Mungin,

---

29. Id. 57–62.

30. Id. 62.

31. CIR sued both in state and federal court. Plaintiffs claim that the lawsuit discussed in the meeting was the federal action. The Court so assumes for purposes of this motion.

32. Carey Dep. 63–65.

33. Id. 68–71, 78–80.

34. See id. 69, 77–78, 81.

35. Id. 91.

36. See id. 49 (deputy mayors present).

37. Giuliani Dep. 6.

38. Harding Dep. 34–37, 93–94.

Mayor Giuliani and at least one of the Wilpons were at the ground breaking ceremony. Id. 10.

39. Glickman Dep. 45, 48, 79; accord Cox Dep. 11, 13, 19.

40. Def. 56.1 St. (DI 46) ¶ 23 (undisputed).

41. Marchiano Dep. 40–43, 52–53

an inspector in the DOB construction division, to inspect the Thunderbolt, which they did on August 31, 2000.[42] As the structure was enclosed by a chain link fence, they viewed and photographed it through a zoom lens with a 12 or 14:1 zoom factor and with binoculars.[43] Mungin testified that he observed substantial deterioration of the steel, including layers of concaved steel and corroded and flaking steel I-beams, as well as a wooden plank or railroad tie that was dislodged near the top of the roller coaster.[44] Padmore too observed that the Thunderbolt was rusting and deteriorated.[45] Indeed, plaintiffs admit as much, although they dispute the extent and significance of the damage.[46]

Following the inspection, Padmore prepared a document called a Special Report.[47] It erroneously identified the premises, on the basis of Padmore's research into DOB records, as 3026/98 West 15th Street, which is block 7074, lot 190, on the tax map, actually the address of a City-owned lot adjacent to the Thunderbolt.[48] On the "Re:" line of the form, Padmore wrote "Borough Commissioner Special." [49] The report went on to state:

42. Padmore Dep. 35, 42, 79.

43. Mungin Dep. 58–59, 61–62, 65, 72–74, 130–31; Padmore Dep. 103–04, 109–10. Padmore only "vaguely" recalled using binoculars. *Id.* 10.

44. Def. 56.1 St. (DI 46) ¶ 30 (undisputed). Plaintiffs challenge the credibility of this testimony on the grounds that (i) the photographs allegedly taken on this occasion were not produced by the City, and Mungin (ii) admitted at his deposition that he was too far away to gauge how much of the structure had been eaten away by rust, and (iii) was unable to identify any areas of concaved steel or corroded and flaking steel I-beams in other photographs he was shown at his deposition. Pl. Opp'n 56.1 St. (DI 55) ¶ 30. Plaintiffs, however, misstate Mungin's testimony. In fact. he testified that he "was too far away to put a measurement on how much was actually eaten away[, but that s]ubstantial sections were eaten away in various steel supporting columns." Mungin Dep. 71. Moreover, plaintiffs have submitted no evidence that the photographs that Mungin was shown at his deposition were accurate representations of the Thunderbolt at the time of the inspection or that they were comparable in degree of enlargement to the views that Mungin saw through the zoom lens and binoculars on the date of the inspection. Indeed, Mungin testified unequivocally that he "was able to determine that the steel structure was eaten away with by [*sic*] the binoculars and the original pictures [he] saw through the camera" and that the pictures he and Padmore took were from "much closer" to the structure than those he was shown at the deposition Mungin Dep. 80, 84–85, 116–17, 130–31.

45. Padmore Dep. 147, 152; Devine Decl. (DI 46) Ex. J.

46. Pl. Opp'n 56.1 St. (DI 55) ¶ 31. Plaintiffs assert that the rust was superficial. The only evidence regarding the alleged superficiality of the rust was a statement by Andrew Badalamenti that the rust he had observed was "facial." Badalamenti Dep. 173. Badalamenti, however, was simply the caretaker of the roller coaster whose regular job was as a hostler of police department horses. *Id.* 20–21, 59–60, 102. He has functioned as a mechanic and operator of amusement park rides, but he made no repairs on the Thunderbolt during the period 1988 through its demolition. *Id.* 24–27, 74–75. There is no evidence that he is qualified to express an opinion as to whether any rust he observed was of structural or safety significance. To that extent, the Court excludes his testimony. *See* FED. R. CIV. P. 56(e) (evidence in support of and in opposition to summary judgment motions must be admissible in evidence); *see, e.g., Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 123–24 (2d Cir.2001) (same); *Raskin v. Wyatt Co.,* 125 F.3d 55, 65–66 (2d Cir.1997) (same).

47. Def. 56.1 St. (DI 46) ¶ 31 (undisputed in all material respects).

48. *Id.* ¶ 33 (undisputed).

49. Devine Decl. (DI 46) Ex. J.

"Inspection revealed the steel/metal structural members throughout the entire thunderbolt [*sic*] ride appear defective, severely rusted and deteriorating."

"In addition, the entire east and west cat walk wood floor and railing rotted, defective and deteriorating throughout and missing at various locations."

"The above is creating a dangerous condition. As a result, I am recommending the premises be process [*sic*] for emergency demolition. ECB violation number 083100C13T01 issued. See copy attached."[50]

Padmore completed also an Environmental Control Board ("ECB") notice of violation and hearing form.[51] He filled in a box headed "Basis of Violation" with the phrase "Commissioner Special."[52] His description of the violation was similar to that in the Special Report, although it ended with the language: "Remedy: make premises safe, and submit engineer's report as to structural stability or demolished to grade & obtain a permit."[53] The ECB notice of violation, however, never was processed.[54]

### 3. The Emergency Declaration and Notices

Following his receipt of these documents, Zeid, the borough commissioner, issued an Emergency Declaration which required demolition of the roller coaster.[55] Zeid testified that he "made that decision based on the recommendations that came in front of [him.]"[56] When asked how he had decided to demolish the roller coaster in light of the fact that the ECB notice, unlike the Special Report, had indicated that repair was an option, Zeid said that he made the decision after conferring with Padmore and "the chief"—a reference to DOB Brooklyn Administrative Chief Inspector Darral Hilton, who concurred in the declaration—"that went around the situation where the structural integrity was involved."[57]

This testimony is somewhat vague, and it is rendered more troubling by Zeid's apparent awareness of Padmore's limitations. He stated that (1) although a qualified individual could get "a good indication" of the structural soundness of rusted steel by visual inspection and touching or sounding it, he believed at the time that Padmore, upon whose report he purportedly relied, was not qualified to do so,[58] (2) there were engineers in his department who were qualified,[59] and (3) neither he nor those engineers examined the structure.[60]

In any case, when the declaration form was completed, the word "immediate" pre-

---

50. *Id.*

51. Padmore Dep. 22–26; PX 19–21.

52. Plaintiffs suggest that this term implies something nefarious. There is no evidence, however, that it means anything beyond what defendants in any case admit—that the order for the inspection came to Padmore from the office of the DOB borough commissioner. Zeid Dep. 19–23, 52–55. 70. Borough commissioners issue such orders when complaints come to their attention from private citizens, elected officials or others. *Id.* 20–22, 52–53.

53. PX 20.

54. Pl. Moving 56.1 St. (DI 43) ¶ 32.

55. Zeid Dep. 175.

56. *Id.* 192–97

57. *Id.*

Hilton and Padmore recalled no such discussion. Hilton Dep. 60; Padmore Dep. 346.

58. Zeid Dep. 182–88.

59. *Id.* 188.

60. *Id.* 188–89.

ceding the word "emergency" was crossed out,[61] thus indicating that declaration was an Emergency as opposed to an Immediate Emergency.[62]

City Hall again was involved in the process following Zeid's issuance of the declaration. Former Deputy Mayor Harding testified in substance that he learned that the roller coaster had been inspected and was informed that it was "in bad shape" and "a safety issue." He therefore recommended to the Mayor that it be demolished, and the Mayor accepted the recommendation.[63] There is no evidence, however, that either actually saw any documentation concerning its condition.[64]

Once the DOB issued the Emergency Declaration, it automatically issued a notice to a city agency, "City Wide." which owned the adjacent lot erroneously listed in Padmore's reports. The letter directed that the structure "be repaired or demolished immediately" failing which the City would do so at City Wide's expense.[65]

On or about September 20, 2000, DOB learned of the error in the address and owner of the property indicated on the Emergency Declaration. It thereupon issued an amended Emergency Declaration correctly listing the property as 1507 Boardwalk, block 7074, lot 105, and the owner as Wantanabe.[66] It erroneously listed Wantanabe's address as 333, rather than 3333, Henry Hudson Parkway in Riverdale. DOB issued also a corrected notification letter, this one properly directed to Wantanabe but bearing the same incorrect address.[67] The evidence that the letter actually was sent to Wantanabe, even at the wrong address, is based on whatever interpretation might be placed on the word "issued" and Zeid's testimony that such letters go out automatically.[68]

On September 22, 2000, HPD, which was responsible for the actual demolition,[69] also sent a notice to Wantanabe to the effect that HPD would "engage a contractor to cure the emergency condition" on the Thunderbolt premises unless it acted immediately to cure the problem, which was unspecified.[70] This notice was sent to an address obtained by HPD from the Department of Finance which proved to be incorrect, and it was returned to HPD.[71] In any case, plaintiffs deny receipt from the

61. *Id.* 177–78; Devine Decl. (DI 46) Ex. L.

62. Zeid Dep. 177, 214; *see also* Mineo Dep. 84.

63. Harding Dep. 106–07, 111–13, 138–40, 161.

64. *See id.* 123–24; Giuliani Dep. 58.

65. Devine Decl. (DI 46) Ex. M; *see* Def. 56.1 St. (DI 46) ¶ 36; Zeid Dep. 198–99.
So much of the form letter as purportedly gave the owner the option to repair the structure was inconsistent with Zeid's determination that it was to be demolished. *Id.* 200.

66. As plaintiffs claim, it appears that the amended declaration was a markup of the original declaration with the date left unchanged and without a new signature by Zeid. Zeid Dep. 215–18. Plaintiffs assert that the amended emergency declaration and corrected notification letter were not "issued." Pl. Opp'n 56.1 St. (DI 55) ¶ 42. PX 30 and 31, the only evidence plaintiffs cite, are merely copies of the amended emergency declaration and the corrected notification letter and do not support the contention that either was not "issued."

67. Def. 56.1 St. (DI 46) ¶ 42 & Devine Decl. (DI 46) Exs. P, Q (undisputed in any material respect).

68. *See* Zeid Dep. 239.

69. *See, e.g.*, Pl. Mov. 56.1 St. (DI 43) ¶ 69.

70. PX 35.

71. McArdle Dep. 132–33.

City of any notice prior to the demolition.[72]

### 4. The Demolition

In or about November 2000, Michael J. Berfield, the EDC official responsible for the minor league stadium project, called HPD Assistant Commissioner Mustaciulo to determine the status of the Thunderbolt in light of a report from the DOB that had indicated that the structure should be demolished.[73] Mustaciulo then telephoned Eugene McArdle, HPD's director of demolition, to check on the status of the demolition. McArdle thereupon put the demolition job out for bid,[74] and NBI was selected as the contractor.[75]

On November 16, 2000, four HPD employees, including the agency's spokesperson and a photographer, visited the Thunderbolt site. A Coney Island preservation advocate who happened to be there told the HPD spokesperson, who was aware of the impending demolition, that the proposed demolition in his opinion would be improper because the "DOB order was for a City-owned lot [and] notice went to the City and not to Bullard." [76] There is no evidence as to how this individual learned this information or that the HPD spokesperson took any action in response to his comment.

At or about the same time, Mustaciulo, who believed that someone was likely to be on the site with dogs when the demolition was scheduled to begin, called the police department and requested its assistance.[77] On the morning of November 17, 2000, two mounted police officers went to the home of the Thunderbolt's caretaker, Andrew Badalamenti. Badalamenti, who as previously noted was employed also by the police department as a hostler at the same location as the two officers, knew them. The officers told Badalamenti to get dressed and come with them, as the roller coaster was being taken down. Badalamenti suggested that the officers return to the nearby police barn where he and the officers worked and that he would meet them there after he dressed. The officers said they would wait for him. After Badalamenti showered, the officers "said come on, we'll get something to eat." Badalamenti said he had to call his boss. The officers "said all right, we're going to a diner in Sheepshead Bay and then we will call your boss." The trio proceeded to the diner where Badalamenti called Bullard and told him that the roller coaster was being taken down. Bullard told Badalamenti to "get down there" and identify the people involved. Badalamenti mentioned this to the officers, who told him that he would "wind up getting in trouble" if he went there and that they would take him to the barn instead, which they did. No force was used or threatened, and Bada-

---

72. Bullard Aff. (DI 41) ¶ 16.

73. Berfield Dep. 100–01, 111–14, 135–40; Def. 56.1 St. (DI 46) ¶ 45.
Further, Carey testified that at some point in November, probably during the week of November 13, 2000, Berfield, Robert Balder and possibly Glickman returned from a meeting at City Hall about the baseball stadium and reported to him that "the Thunderbolt [was] going to be taken down over the weekend" by HPD because "it was a safety issue, that it was in very bad condition, [and] that it posed a specific hazard." Carey Dep. 88–92.

74. Def. 56.1 St. (DI 46) ¶ 48 (undisputed).
It is undisputed also that HPD handles 200 to 250 demolitions each year and that it typically takes the agency 30 to 45 days to respond to an emergency declaration. Id. ¶ 44 (undisputed).

75. Id. ¶¶ 49–50 (undisputed).

76. Abrams Dep. 6–7, 112–22.

77. Mustaciulo Dep. 190–96.

lamenti testified that he felt free to go at any time.[78]

The Thunderbolt was demolished by NBI on behalf of the City beginning on November 17, 2000.[79]

## II

### A. Procedural Due Process

Wantanabe alleges that the defendants, knowing that they could not justify demolition if they resorted to the Unsafe Building Procedure, conspired "to simply ... demolish the roller coaster"[80] and went through a sham inspection and emergency declaration to paper over their actions.

Defendants dispute plaintiffs' claim of a conspiracy to tear down the roller coaster without prior notice. They claim, moreover, that their actions were entirely appropriate, and they rely heavily on *Catanzaro v. Weiden*,[81] where the Court of Appeals held that:

"where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist, or that affording predeprivation process would be otherwise impractical, the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion."[82]

Notwithstanding *Catanzaro*, the alleged scheme to tear down the roller coaster is at the heart of the due process claim. It is relevant to the procedural due process claim because defendants' reliance upon *Catanzaro* depends in no small measure on the City's evidence as to the condition of the Thunderbolt, the credibility of which conceivably could be undercut if the alleged conspiracy existed. In other words, if the evidence supported the contention that defendants plotted to tear down the roller coaster without giving Wantanabe a prior chance to challenge that action, it might cast doubt on the *bona fides* of defendants' contentions regarding the condition of the roller coaster. It is central also to the substantive due process claim. The alleged scheme therefore is the starting point for analysis.

On a motion for summary judgment, a court must accept as true all allegations of the nonmoving party that are supported by admissible evidence and draw all reasonable inferences in its favor.[83] While circumstantial evidence is considered,[84] mere speculation and conjecture is insufficient to defeat such a motion.[85] The issue ultimately is whether a fair-minded jury could return a verdict for the nonmovant on all of the evidence.[86] Accordingly, the first question is whether the evidence, viewed by this standard, is sufficient to justify a finding that defendants culpably

---

**78.** Badalamenti Dep. 99–110.

**79.** Def. 56.1 St. (DI 46) ¶ 51 (undisputed).

**80.** Cpt. ¶ 53.

**81.** 188 F.3d 56 (2d Cir.1999).

**82.** *Id.* at 63.

**83.** *E.g., Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996) (view facts in favor of nonmoving party, drawing reasonable inferences in its favor); Fed. R. Civ. P. 56(e) (evidence in

support of and in opposition to summary judgment motions must be admissible in evidence); *Nora Beverages, Inc.,* 269 F.3d at 123–24; *Raskin,* 125 F.3d at 65–66 (same).

**84.** *E.g., Gayle v. Gonyea,* 313 F.3d 677, 684 (2d Cir.2002).

**85.** *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir.2001).

**86.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

and unjustifiably deprived Wantanabe of notice and an opportunity to challenge the proposed demolition in advance.

■ On this record, a jury would be entitled to find that (a) Mayor Giuliani discussed the roller coaster with the ownership of the Mets, (b) he understood that the Mets would be happier if the roller coaster were torn down, (c) he communicated the view that the Thunderbolt should be inspected and, if possible, demolished to Deputy Mayor Harding, who supervised the EDC, and Carey, its president, (d) Harding caused the DOB to inspect the roller coaster, (e) the results of the inspection and the issuance of the Emergency Declaration in September 2000 were communicated to Harding and EDC, (f) Harding subsequently obtained Mayor Giuliani's approval for demolishing the roller coaster, and (g) Berfield, upon noticing in November that the roller coaster still stood, called HPD to press for demolition.[87] Thus, a trier of fact reasonably could conclude that the impetus for inspecting and demolishing the roller coaster came from City Hall and that the wish of the Mets in relation to the new stadium was a motivating factor. But plaintiffs must show also that a jury would be justified on this record in finding that defendants culpably and unjustifiably deprived Wantanabe of notice and an opportunity to be heard.[88]

The City seeks to head plaintiffs off at the pass by relying on *Catanzaro*. But the case does not bear the weight that defendants place upon it. True enough, the City would have been justified, as a constitutional matter, in tearing down the roller coaster without predeprivation process if "there [was] competent evidence allowing [it] to reasonably believe that an emergency [did] in fact exist, or that affording predeprivation process would be otherwise impractical." [89] But the City's claim that the defendants are entitled to judgment on the procedural due process claim on this basis is unpersuasive. Zeid's issuance of an Emergency, as opposed to an Immediate Emergency, Declaration alone would be sufficient to permit a jury to infer that affording predeprivation process would not have been impractical, given the OPPN's anticipation that demolition in such a case would not begin for thirty to sixty days and the actual lapse of seventy-seven days. Hence, there is a genuine issue of material fact as to whether any lack of predeprivation process was justified on the basis of an alleged emergency. But that is not the end of the matter because it does not resolve the question whether the plaintiffs have sustained their burden of adducing evidence from which an inference of a culpable deprivation of notice may be drawn.

Plaintiffs rely heavily on the evidence that City Hall wanted the roller coaster torn down. But the fact that City Hall evidently put in motion the process for inspecting and, if possible, demolishing the roller coaster does not indicate that it sought to accomplish this end without affording the owner notice and an opportunity to be heard, or even that it acted in reckless disregard of or with deliberate indifference to whether predeprivation process would be afforded. Indeed, a good deal of undisputed evidence is at odds with this hypothesis.

---

**87.** The defendants do not admit all of these facts in precisely these terms. In the Court's view, however, a jury would be entitled to infer this from the evidence now before it.

**88.** *Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (no deprivation of due process absent more than negligence).

**89.** 188 F.3d at 63.

The most important fact, already discussed above, is that the DOB did not issue an Immediate Emergency Declaration which, under the OPPN, would have contemplated demolition within twenty-four hours and thus, as a practical matter, probably without any advance notice to the owner.[90] To the contrary, it issued an Emergency Declaration and issued notices more than two months prior to the date on which the demolition took place. As there is no evidence that the inaccuracies in the notices were deliberate,[91] there is no basis for concluding that any effort was made to demolish the structure without giving advance notice to the owner. Moreover, the fact that seventy-seven days were allowed to pass between the date of the Emergency Declaration and the commencement of demolition is impossible to reconcile with plaintiffs' theory that City Hall set out to deprive Wantanabe of any opportunity to challenge the proposed action.

Plaintiffs rely next on the City's alleged failure to follow the Administrative Code's Unsafe Buildings Procedure. It is arguable that compliance with the UBP was required. Zeid's decision not to make an Immediate Emergency Declaration defeats, at least for purposes of this motion, any contention that the circumstances were so exigent that resort to the Unsafe Building Procedure was excused on the theory that the City had a right to act without notice and a hearing to protect the public from imminent danger. Furthermore, there is good reason to argue that the procedures the City did follow under the OPPN did not satisfy the Unsafe Buildings Procedure for a number of reasons.[92] In the last analysis, however, there is no need to decide these issues.

■ Failure to comply with the Unsafe Buildings Procedure is significant as a constitutional matter to the extent, and only to the extent, that it supports an inference that there was a scheme to deprive Wantanabe of notice and an opportunity to be heard.[93] But no such inference properly may be drawn. For one thing, it is undis-

---

90. The OPPN required the sending of a letter to the owner with respect to either an Immediate Emergency or an Emergency Declaration. Devine Decl. (DI 46) Ex. B. The sending of such a letter in the case of an Immediate Emergency Declaration, however, would be unlikely to result in the owner receiving notice before the demolition took place because a letter probably would not be received within twenty-four hours.

91. Plaintiffs do not dispute that the initial inaccuracy in the address in fact reflected Padmore's belief based on his own research of DOB records. Def. 56.1 St. (DI 46) ¶ 33 (undisputed); Padmore 277–78, 328–29. Indeed, plaintiffs themselves characterize the owner, property address and lot number that appeared in the initial notice as an "error." Pl. Opp'n 56.1 St. (DI 55) ¶ 42. Likewise, plaintiffs concede that the inaccuracy was noticed and that the amended declaration and corrected notice then were prepared. Id. There is no evidence that the erroneous address in the corrected notice was anything more than a simple typographical error in which one of the "3"'s in "3333 Henry Hudson Parkway" was dropped out of carelessness. Nor is there any reason to infer that the address error on the HPD notice was more than negligent. See id.

92. These include at least the following: (1) the notice letter did not conform to the UBP in that it did not describe, among other things, the dangerous condition, made no reference to a survey, and failed to describe the judicial proceedings that could ensue, see N.Y.C. AD. C. § 26–236a, and (2) the City demolished the Thunderbolt without seeking any judicial determination or obtaining a precept from the supreme court, see id. §§ 26–236a, 26–239.

93. Failure to follow the state law-prescribed procedure would not, in and of itself, amount to a due process violation. E.g., Zahra v. Town of Southold, 48 F.3d 674, 682 (2d Cir. 1995); McDarby v. Dinkins, 907 F.2d 1334, 1337 (2d Cir.1990).

puted that the City, as a matter of course, does not resort to the Unsafe Building Procedure even where the DOB issues an Emergency, as opposed to an Immediate Emergency, Declaration.[94] Moreover, the undisputed evidence shows that the City tried to notify the owner of the forthcoming demolition long before that demolition occurred or, for that matter, was expected to occur. Thus, the fact that the City did not resort to the Unsafe Building Procedure in this instance is not probative of the existence of any scheme to avoid giving notice.

Plaintiffs' final bit of evidence—the nature of the inspection and the basis for Zeid's issuance of the Emergency Declaration—is somewhat more troublesome but not ultimately significant to the procedural due process claim. The roller coaster was inspected from afar through a zoom lens and binoculars. The City has not produced the photographs taken on that occasion. Zeid, who said he opted for demolition rather than repair on the basis of the inspection report and the ECB violation notice, admitted that he did not regard Padmore as qualified to make the critical judgment. Moreover, as previously noted, his explanation at his deposition for how he nevertheless determined that the Thunderbolt should be demolished rather than repaired arguably was unconvincing. And while Zeid denied that any influence was brought to bear upon his decision,[95] a jury would not be obliged to credit that denial, particularly in light of Harding's testimony that it ultimately was he and the Mayor who decided, following the inspection, to demolish the structure. Nevertheless, Zeid's decision to issue the Emergency Declaration on the evidence before him, even if it was influenced, intentionally or otherwise by higher ups, is not probative of a scheme to tear down the roller coaster without notice. The fact remains that the obvious way to accomplish such an objective would have been to issue an Immediate Emergency Declaration and then to tear down the roller coaster without delay. Yet Zeid instead took a course that, absent the name and address errors in the notice letters, would have resulted in notice to Wantanabe long before Zeid anticipated that demolition actually would begin. Accordingly, the Court concludes that, while a jury reasonably might find that City Hall pushed for demolition of the roller coaster, there is no reasonable basis for a finding that it sought to deprive the owner of predeprivation process.

There remains the assertion, assumed true for purposes of this motion, that Wantanabe never in fact received notice in consequence of the errors.[96] In the circumstances of this case, however, this is immaterial. There is no basis here for inferring that the errors were products of anything more than simple negligence. Indeed, plaintiffs do not so contend. As noted previously, negligence is insufficient to state a claim for violation of the Due Process Clause.[97] To hold otherwise "would trivialize the centuries-old principle of due process of law" [98] which, of course, "is not to say that [it] may not raise significant legal concerns and lead to the cre-

---

94. *Supra* note 23.

95. Zeid Dep. 192–97.

96. Whether this in fact is correct is not entirely clear. Bullard admits having heard a rumor that the Thunderbolt would be demolished. The Coney Island preservation advocate who confronted HPD officials at the site on November 16, 2000 knew not only of the intended demolition, but the fact that the original notice had been sent to a City agency instead of the actual owner.

97. *Supra* note 88.

98. *Daniels,* 474 U.S. at 332, 106 S.Ct. 662.

ation of protectable interests." [99] But these are matters for state law. They do not rise to federal constitutional matters. Accordingly, Wantanabe's procedural due process claim is dismissed.

## B. Substantive Due Process

The City seeks dismissal of Wantanabe's substantive due process claim, arguing that the evidence is insufficient to justify a finding of sufficiently egregious conduct. Curiously, Wantanabe's opposing papers do not address the substantive due process issue. Nevertheless, the Court is obliged to do so.

■■■■ The substantive component of the Due Process Clause bars "certain government actions regardless of the fairness of the procedures used to implement them." [100] Its "touchstone ... is protection of the individual against arbitrary action by the government," [101] not only by procedural unfairness, but by "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." [102] But the scope of substantive due process is not boundless. Rather, it is limited to "conduct 'that shocks the conscience' and violates the 'decencies of civilized conduct.' " [103] This in turn raises two questions: (1) the differentiation between conduct that is merely wrongful or arbitrary from that which is so shocking as to implicate the Due Process Clause, and (2) the level of culpability that is required for liability.

■■■■ In *Harlen Associates*, the Second Circuit said that "substantive due process 'does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit. ... [Its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." ' [104] And it went on to make clear that violation of state laws and regulations alone is insufficient, adding that a substantive due process claim is made out only where the defendant's conduct "transgresses the 'outer limit' of legitimate governmental action." [105]

■■■■ Borough Commissioner Zeid here issued the Emergency Declaration based on Padmore's inspection report and ECB violation notice after conferring with Padmore and Hilton.[106] A jury would be entitled to find that the only aspects of the report and notice which even arguably supported demolition were the statements that the "steel/metal structural members throughout the entire thunderbolt ride appear defective, severely rusted and deteriorating," [107] assessments that appear suspect in view of the fact that the inspection was conducted from outside the fence. Moreover, as noted above, Zeid said also that he believed that Padmore was not

99. *Id.* at 333, 106 S.Ct. 662.

100. *Id.* at 331, 106 S.Ct. 662.

101. *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

102. *County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

103. *Id.* (quoting *Rochin v. California,* 342 U.S. 165, 172–73, 72 S.Ct. 205, 96 L.Ed. 183 (1952)).

104. *Harlen Associates,* 273 F.3d at 505 (quoting *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir.1999)).

105. *Id.*

106. There is no evidence that Zeid received any input bearing on the structural soundness of the roller coaster.

107. Devine Decl. (DI 46) Ex. J; *see* PX 20.

qualified to judge the extent to which any visible rust affected the strength of the steel. He knew that no engineers qualified to make such a determination had inspected the structure and that no laboratory tests had been done for that purpose. Yet he concluded that the roller coaster should be demolished. Further, when asked to explain why, on the basis of the apparently limited information before him, he decided to order demolition rather than repair of the Thunderbolt, he gave vague and arguably evasive answers. Thus, a reasonable trier of fact, at least on the present record, could find that Zeid had no responsible basis for determining that there was sufficient reason to demolish the roller coaster and that he knew it. Furthermore, in light of Zeid's testimony that he discussed the decision with Chief Inspector Hilton, a jury would be entitled to infer also that Hilton was equally knowledgeable of the deficiencies in the data upon which the decision was made, but nevertheless concurred in it.

In reviewing administrative actions like this under the state law "arbitrary and capricious" standard, a New York court first would determine the facts upon which the administrative action was taken [108] and then would proceed to consider whether the action was "without sound basis in reason" or "generally . . . without regard to the facts." [109] Viewing the present evidence in the light most favorable to plaintiffs, Zeid arguably issued the Emergency Declaration without a sound basis in reason. Hence, the Court cannot now exclude the possibility that the issuance of the declaration was arbitrary and capricious under New York law.

The harder question is whether, based on facts that reasonably might be found by a jury, the issuance of the Emergency Declaration was more than arbitrary and capricious—i.e., whether the basis for the decision was so unsound that the decision was "so outrageously arbitrary as to constitute a gross abuse of governmental authority."

█ In all of the circumstances, the Court cannot exclude the possibility that the issuance of the Emergency Declaration was not merely wrong or ill-advised, but outrageously arbitrary. The decision is hard to justify, even when viewed in isolation, given Zeid's testimony about Padmore's lack of qualifications to judge the structural integrity of the steel. But it cannot be judged in isolation. A jury could find that City Hall had communicated a desire that the roller coaster be inspected and torn down. It could find also that the matter was of sufficient concern, at least to EDC, that EDC followed up after the declaration was issued to see why the demolition had not occurred. Although Zeid denied that any outside influence was brought to bear on his decision, a jury would not be obliged to credit that testimony.[110] And if a trier of fact were

---

**108.** *See, e.g., Celestial Food Corp. of Coram, Inc. v. State Liquor Auth.*, 99 A.D.2d 25, 27 n. *, 471 N.Y.S.2d 654, 656 n. * (2d Dept.1984); *Pasta Chef, Inc. v. State Liquor Auth.*, 54 A.D.2d 1112, 1112–13, 389 N.Y.S.2d 72, 73–74 (4th Dept.1976), *aff'd* 44 N.Y.2d 766, 406 N.Y.S.2d 36, 377 N.E.2d 480 (1978); *Rochester Colony, Inc. v. Hostetter*, 19 A.D.2d 250, 252–53, 241 N.Y.S.2d 210, 213 (4th Dept. 1963).

**109.** *Pell v. Board of Ed.*, 34 N.Y.2d 222, 231, 356 N.Y.S.2d 833, 839, 313 N.E.2d 321 (1974) (in part quoting *Colton v. Berman*, 21 N.Y.2d 322, 329, 287 N.Y.S.2d 647, 650–51, 234 N.E.2d 679 (1967)); *accord, e.g., Lyons v. Whitehead*, 291 A.D.2d 497, 498–99, 738 N.Y.S.2d 671, 673 (2d Dept.2002).

**110.** Summary judgment ordinarily cannot be defeated merely by a contention that a jury might disbelieve a movant's witnesses. Where, however, there are "specific bases for

persuaded that Zeid issued the declaration, despite the paucity of justification before him, because he understood that City Hall wanted the roller coaster torn down, the combination of circumstances could amount to the sort of conduct that implicates substantive due process.

This of course is not the end of the analysis. Some level of culpability is required. As the Supreme Court has written, "the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability."[111] While the precise level of culpability required in a case like this perhaps is not entirely clear, it is safe to say that intentional conduct that otherwise is sufficiently egregious would be sufficient while merely negligent conduct would not.

Here, Zeid's apparent knowledge of the lack of justification for the demolition could provide the requisite level of culpa-bility. Thus, the substantive due process claim against Zeid and, in light of his policy-making role, the City[112] cannot be dismissed at this stage, as these defendants have failed to demonstrate the absence of a genuine issue of material fact.

Hilton's position is slightly but not materially different. He testified in substance that he concurred in the Emergency Declaration, essentially as a matter of routine and without seeing either the inspection report or the ECB violation notice, without inspecting the roller coaster himself, and without discussing the matter with Padmore or Zeid.[113] On the other hand, Zeid testified that he went over the issue with Hilton and Padmore and that Hilton concurred in his conclusion. On the latter version of the facts, the possibility of a reasonable finding that Hilton was as aware of any infirmities in the declaration as Zeid cannot be excluded. Accordingly, the motion to dismiss this claim as to Hilton cannot be granted either.

possible impeachment," credibility questions in appropriate circumstances may result in denial of such a motion. *See, e.g.,* 10A CHARLES ALAN WRIGHT, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 2726, at 445–47 (1998). Of course, disbelief of a movant's denial of a fact which the non-movant has the burden of proving is not sufficient to sustain that burden. *E.g., Venzie Corp. v. United States Mineral Prods. Co.,* 521 F.2d 1309, 1312 (3d Cir. 1975) ("mere disbelief [of defendants' denials] could not rise to the level of positive proof of agreement to sustain plaintiffs' burden of proving conspiracy"); *Ortho Diagnostic Systs., Inc. v. Abbott Labs., Inc.,* 920 F.Supp. 455, 477 (S.D.N.Y.1996) (same). Here, however, the Court cannot exclude the possibility that a jury reasonably could infer from City Hall's wishes, its having set the inspection process in motion, EDC's continued interest in the demolition, the apparent lack of basis for Zeid's decision, and Zeid's position in the City hierarchy that Zeid was motivated to disregard the facts in order to facilitate achievement of City Hall's evident desire.

**111.** *Lewis,* 523 U.S. at 848, 118 S.Ct. 1708.

**112.** "In order to cast a municipality in damages for a Section 1983 violation by one of its agents, the plaintiff must plead and prove that the injury complained of was the consequence 'of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy ....'" *Blasetti v. Pietropolo,* 213 F.Supp.2d 425, 430 (S.D.N.Y.2002) (citing *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "[W]here an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy." *Clue v. Johnson,* 179 F.3d 57, 62 (2d Cir.1999) (quoting *Rookard v. Health & Hosps. Corp.,* 710 F.2d 41, 45 (2d Cir.1983) (internal quotation marks omitted)).

**113.** Hilton Dep. 37, 39–40, 60.

■ There remain for consideration twelve other defendants ranging from former Mayor Giuliani on down to NBI and its principal, Noto. While the complaint seeks to hold them responsible for any substantive due process violation that may have occurred on the basis of an alleged conspiracy, the bald allegation of conspiracy simply is not enough at the summary judgment stage.

■ A conspiracy is an agreement or understanding to achieve an unlawful objective. Thus, in order to create an issue for trial, a plaintiff alleging a conspiracy must come forward with admissible evidence, whether direct or circumstantial, that would justify a reasonable jury in finding not only that the defendants acted in concert, but that they did so for the purpose of achieving the alleged objective.[114] On this claim, the only legally sufficient objective is the demolition of the roller coaster by means "so outrageously arbitrary as to constitute a gross abuse of governmental authority"—viz., through the issuance of an Emergency Declaration calling for demolition with knowledge that there was no sufficient basis for such action or in reckless disregard of, or with deliberate indifference to, whether there was a sufficient basis. While there is ample basis for concluding that City Hall wished to have the roller coaster demolished, there is no evidence that any of the defendants (other than Zeid and Hilton) ever even entertained the possibility that it would be demolished without regard to its actual condition, much less embraced that as an objective. Accordingly, the substantive due process claim will be dismissed as

to all defendants other than the City, Zeid and Hilton.

## C. Equal Protection

Wantanabe's equal protection claim asserts that he was treated differently from others similarly situated in that the City did not resort to the UBP and that this alleged deprivation of his equal protection rights "was carried out by Mayor GIULIANI based, in part, upon racially motivated animus against" Bullard "and/or under the aforesaid circumstances, qualifying plaintiffs [sic] as a 'class of one' authorized to bring an equal protection claim pursuant to Willowbrook v. Olech, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)."[115] The lynchpin of the claim thus is the premise that the City discriminated against Wantanabe by not following the UBP in seeking to demolish the roller coaster.

The City asserts that the failure to adhere to the UBP in seeking demolition of the Thunderbolt following the Emergency Declaration in fact reflected its regular practice and that plaintiffs can adduce no evidence to the contrary. It maintains, therefore, that there is no genuine issue of fact as to whether Wantanabe was treated differently in this respect than others similarly situated. And while plaintiffs resist dismissal of Wantanabe's equal protection claim, they have conceded that the City is correct as a factual matter. Their memorandum concedes that "the City, as a matter of *de facto* policy, practice and procedure, regularly carries out non-immediate 'Emergency' demolitions without following the U.B. procedure and without a Precept."[116] Accordingly, insofar as Wantan-

---

114. *E.g., AD/SAT, a Div. of Skylight, Inc. v. Associated Press,* 181 F.3d 216, 234 (2d Cir. 1999); *Bell v. City of Milwaukee,* 746 F.2d 1205, 1254 (7th Cir.1984); *see Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 240 (2d Cir.1999).

115. Cpt. ¶¶ 125–27.

116. *Supra* note 23.

Plaintiffs admit also that "[i]t was the practice and policy of HPD to treat Emergency Declarations as orders; with an Emergency Decla-

abe's equal protection claim rests on the premise that it was treated differently in that the City did not pursue the UBP in its case, it must be dismissed.

 Perhaps recognizing this, Wantanabe now seeks to shift to a new theory, viz. that Wantanabe was treated differently in that it was subjected to a sham inspection and a politically driven demolition process.[117] It contends that it "should be permitted to take [a] 'class of one' equal protection claim to the jury." [118] This ef-

fort comes too late [119] and, in any case, is the proverbial dollar short.

 In order to prevail on a "class of one" equal protection claim of this nature, Wantanabe would be obliged to establish that it was (1) "intentionally treated differently from others similarly situated and [ (2) ] that there [was] no rational basis for the difference in treatment." [120] In this context, it would have to show that other property owners whose structures for some reason were unwanted by high City

ration, DOB makes the determination whether to demolish a structure." They go on to argue that "[t]he fact that the D.O.B. takes it upon itself to make a determination of whether to demolish a structure, rather than seeking such determination in the courts in the context of a U.B. Proceeding, is also not disputed. What is disputed is any implication that D.O.B. had a right to make such a determination or that H.P.D. had a right to treat such a D.O.B. determination as an order." Pl. Opp'n 56.1 St. (DI 55) ¶ 41.

117. *See* Pl. Mem. Opp'n 30.

118. *Id.*

119. Plaintiffs in substance seek leave to amend the complaint to assert a new theory of liability. While leave to amend ordinarily is granted freely "when justice so requires," *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (quoting FED. R. CIV. P. 15(a)), "the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir.2002); *accord Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 87 (2d Cir.2002); *Grace v. Rosenstock*, 228 F.3d 40, 53 (2d Cir.2000), *cert. denied, Grace v. Genser*, 532 U.S. 923, 121 S.Ct. 1362, 149 L.Ed.2d 290 (2001).

This action was commenced on November 16, 2001, almost one year after the start of demolition. The scheduling order, entered January 29, 2002 and never modified in this respect, required that any application for leave to amend be made on or before April 1, 2002. The date for completion of discovery—which

ultimately involved at least twenty-one depositions, extensive document production, and contentious disputes requiring court intervention—ultimately was July 15, 2002 although discovery was not in fact concluded until at least late October 2002.

The complaint makes perfectly clear that Wantanabe claimed from the outset that the inspection was a sham and that it was subjected to a politically driven process, yet it never asserted that these circumstances gave rise to an equal protection claim until it filed its response to defendants' motion in December 2002. Nor has it offered an explanation for failing to have done so. And the prejudice to the defendants is clear. After completing an extensive and costly discovery process, amendment would confront them with an entirely new factual issue—whether Wantanabe was treated differently than other property holders whose structures were unpalatable to the political powers that be and therefore were subjects of attempts to procure their demolition. This would require the reopening and a substantial expansion of discovery and result in considerable expense and delay. It would do so, moreover, after a change of administrations and after the facts have become, at least to some degree, stale. In consequence, the Court would deny leave to amend for failure to comply with the scheduling order, delay which in the circumstances was undue, and prejudice to the defendants. It is unnecessary, however, to rely on that basis in light of the Court's conclusion that the new theory could not survive the motion in any event.

120. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

officials were not also subjected to sham inspections and politically driven demolition processes. Yet Wantanabe has not offered any evidence that it was treated differently from others similarly situated. As Wantanabe would have the burden of proving such disparate treatment at trial,[121] its failure to adduce admissible evidence sufficient to go to the jury on this issue is fatal to this claim.[122]

■ The final matter to be considered, despite the fact that it was not raised in plaintiffs' brief as a basis for sustaining the equal protection claim, is the fact that the complaint alleges that the City did not follow the UBP in this case based in part on racially motivated animus on the part of former Mayor Giuliani.[123] Reading the complaint generously, the Court construes it as asserting that Wantanabe was the subject of intentional, race-based discrimination, a claim that requires neither pleading nor proof of a better treated, similarly situated group.[124] The Court therefore proceeds to consider whether there is any evidentiary support for this assertion.

The claim of race-based discrimination rests entirely on the assertion that former Mayor Giuliani, "based upon prior dealings while [mayor] and prior litigation while [mayor], and based upon his prior poor dealings with New York City's African–American Community in general, had a personal animus towards plaintiff BULLARD, a minority (African–American) ...." [125] There is evidence that Mayor Giuliani had met Bullard on one and perhaps as many as three occasions, and a jury therefore would be entitled to infer, despite his denial,[126] that he was aware that Bullard was a person of color. He knew that Bullard owned or had an interest in the roller coaster.[127] What is utterly lacking, however, is any evidence that he bore any animus toward African–Americans or

---

**121.** The Second Circuit has held that a plaintiff alleging intentional discrimination need not allege and prove the existence of "a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection." *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir.2001). In substance, the law presumes that persons who do not share the plaintiff's racial characteristic are or would be treated differently by a defendant motivated by racial animus. This does not, however, alter the usual rule where the basis for the allegedly unequal treatment is not racial or, perhaps, some other ethnic or similar prejudice. *See Russo v. City of Hartford*, 158 F.Supp.2d 214, 232 (D.Conn.2001) (dismissing as legally insufficient, after *Pyke*, an equal protection claim based on allegedly disparate treatment of a police officer based on failure to "allege that the state defendants treated him any differently than others who were similarly situated").

**122.** *E.g., Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (when non-moving party bears burden of proof at trial, moving party is entitled to summary judgment if non-movant fails to make showing on essential element of its claim);

*Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *Sadler v. Moran Towing Corp.,* 204 F.Supp.2d 695, 696 n. 7 (S.D.N.Y.2002); *Clark v. Meyer,* 188 F.Supp.2d 416, 423–24 & n. 39 (S.D.N.Y. 2002); *Frank v. Plaza Constr. Corp.,* 186 F.Supp.2d 420, 434–35 & n. 75 (S.D.N.Y. 2002); *Diamond Direct, LLC v. Star Diamond Group, Inc.,* 116 F.Supp.2d 525, 531 & n. 38 (S.D.N.Y.2000).

**123.** Cpt. ¶ 127.

**124.** *Supra* note 121.

**125.** Cpt. ¶ 42.

**126.** Giuliani Dep. 211–12.

**127.** Def. 56.1 St. (DI 46) ¶ 65.

other persons of color. Indeed, when Bullard was asked the basis for his contention at his deposition, he responded only with conclusory allegations.[128]

 No doubt recognizing their complete failure of proof, plaintiffs ask the Court "to take judicial notice of Mayor Giuliani's stormy relationship with minority, particularly African American, minority communities"[129] as a basis for inferring racial animus. Judicial notice, however, is limited to a fact that is:

> "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."[130]

No citation of authority is required for the proposition that an alleged "stormy relationship" with minority communities, whatever precisely that means, is not the sort of objective fact that is beyond reasonable dispute. Accordingly, the Court declines to take judicial notice.[131]

For all of the foregoing reasons, defendants are entitled to summary judgment dismissing the equal protection claim.

### D. The Reconstruction Act Claims

#### 1. Section 1985(3)

The crux of the fourth claim for relief is that the:

> "aforementioned deprivation of equal protection ... was ... based upon racially motivated animus *as aforesaid,* [and that] defendants have also violated

42 U.S.C. § 1985(3) by conspiring to enter and indeed entering WANTANABE's premises for purpose of depriving minority-owned WANTANABE of its aforesaid right to equal protection of the laws."[132]

The racial animus alleged elsewhere in the complaint is attributed to former Mayor Giuliani alone.

This claim—which plaintiffs do not even mention in their brief in opposition to the defendants' motion—fails. There is no proof that Wantanabe was treated differently from others similarly situated and no evidence of the alleged race-based animus. Hence, there is no evidence of any conspiracy to deprive Wantanabe of the equal protection of the laws.

#### 2. Section 1985(2)

 The sixth claim, unlike all of the others, is brought not only on behalf of Wantanabe, but also of CIR and Bullard. It alleges that former Mayor Giuliani's actions were motived in part by a desire to retaliate "by use of force" against all three plaintiffs because CIR had sued the City in federal court over the alleged lease and Bullard had participated in the action, and that Giuliani bypassed the UBP for the purpose of depriving Wantanabe, "by use of force, ... of access to the courts to protect its property rights ...."[133] It seeks to impose liability under 42 U.S.C. § 1985(2) against the other defendants on the basis of an alleged conspiracy with former Mayor Giuliani.

---

**128.** Bullard Dep. 89–95.

**129.** Pl. Mem. Opp'n 29.

**130.** FED. R. EVID. 201(b).

**131.** Rule 201(d), moreover, makes judicial notice mandatory only where the Court is "sup-

plied with the necessary information." Plaintiffs have not done so.

**132.** Cpt. ¶ 135 (emphasis added).

**133.** Cpt. ¶¶ 152–53.

Section 1985(2), in relevant part, creates a damage remedy in favor of any person injured in consequence of a conspiracy: "[1] to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, ... or to injure such party or witness in his person or property on account of his having so attended or testified, or ... [2] for the purpose of impeding, hindering, obstructing or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." [134]

The claim of a conspiracy to impede justice in the effort to demolish the Thunderbolt rests on the assertion that the defendants deliberately bypassed the allegedly "exceptionally well-known ... requirements of the" UBP,[135] resort to which necessarily would have involved a proceeding in the New York Supreme Court. As this involved a potential state court proceeding, it comes under clause [2] of Section 1985(2).

■■■ The Court assumes without deciding that a conspiracy to bypass the UBP for the purpose of foreclosing a property owner from its state court remedy under that statute would come within the "hindering" language of the statute. The

claim nevertheless fails, as a claim under Section 1985(2) for conspiracy to hinder justice in a state court is sufficient only if "the conspirators act with intent to deprive their victims of the equal protection of the laws." [136] As indicated above, there is no evidence to support any claim of an intent to deprive any of these plaintiffs of the equal protection of the laws.

■■■ The claim of retaliation for the actions of CIR and Bullard in connection with the prior lawsuit comes under clause [1] of the statute, as that action was brought in the federal courts. Claims under clause [1] do not require proof of intent to deprive the plaintiff of equal protection.[137] But this claim too fails.

■■■ A clause [1], Section 1985(2) retaliation claim requires (a) a conspiracy, (b) an object of which is to injure (c) a party or a witness in an action in the federal court, (d) in retaliation for the activity as a litigant or witness and (e) consequent injury. Retaliation requires (a) the plaintiff's participation in protected activity, here a federal lawsuit, (b) the defendant's awareness of that participation, (c) the defendant's action in a manner materially adverse to the plaintiff, and (d) a causal connection between the adverse action and the protected activity.[138] Thus, to survive this aspect of the motion, plaintiffs were obliged to adduce evidence sufficient to justify findings that (1) they were par-

---

134. 42 U.S.C. § 1985(2).

135. Cpt. ¶ 156.

136. *Kush v. Rutledge*, 460 U.S. 719, 724–25, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983).

137. *Id.*

138. These are the elements of retaliation claims for activity protected by various anti-discrimination statutes and for assertion of First Amendment rights. *E.g., Mack v. Otis*

*Elevator Co.*, 326 F.3d 116, 129 (2d Cir.2003) ( Title VII); *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir.2001) (Americans with Disabilities Act); *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999) (First Amendment). While the parties have not cited, and the Court has not found, a case clearly setting forth the elements of retaliation under Section 1985(2), there is no reason to believe that they are any different.

ties or witnesses in the prior federal action, (2) two or more defendants, knowing of plaintiffs' participation, conspired (3) for the purpose of retaliating against them, and (4) consequently took material adverse action (5) which caused them injury.

It is undisputed Wantanabe was neither a witness nor a party [139] in the prior action. Its retaliation claim therefore must be dismissed.

■ Nor can Bullard's claim survive. The roller coaster and the land on which it stood were owned by Wantanabe.[140] Although Bullard claims to own Wantanabe through a nominee,[141] even a shareholder of record cannot recover damages for diminution in the value of the shares in consequence of an injury to the corporation.[142]

That leaves CIR. The complaint here alleges that CIR was injured in that it "suffered a loss of development opportunities involving the roller coaster" and the building beneath it.[143] But these allegations are insufficient as a matter of law. The simple fact is that CIR did not own or,

so far as the complaint alleges, have any interest in the roller coaster and building or the land on which they stood.[144] Accordingly, the sixth claim for relief must be dismissed.

### 3. Section 1986

Wantanabe's fifth claim for relief asserts that each defendant knew of the UBP, knew of the alleged conspiracy to deprive it of the equal protection of the laws, and therefore had the opportunity to prevent those alleged violations of its rights. This, it contends, violated 42 U.S.C. § 1986.

The statute upon which Wantanabe relies provides in relevant part:

"Every person who, having knowledge of any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to

---

**139.** Judge Glasser's and the Second Circuit's opinions dismissing and affirming the dismissal of the prior action both indicate that CIR was the only plaintiff. *Coney Island Resorts, Inc. v. Giuliani*, 103 F.Supp.2d 645 (E.D.N.Y.2000), *aff'd*, 11 Fed.Appx. 11 (2d Cir.), *cert. denied*, 534 U.S. 1054, 122 S.Ct. 644, 151 L.Ed.2d 562 (2001). This is confirmed by the docket sheet, which is available on the WebPacer system.

**140.** Cpt. ¶¶ 27–28.

**141.** *Id.* ¶ 25.

**142.** *Potthoff v. Morin*, 245 F.3d 710, 716–17 (8th Cir.2001) (shareholder cannot sue under 42 U.S.C. § 1983 for injury to corporation); *Gregory v. Mitchell*, 634 F.2d 199, 202 (5th Cir.1981) (same); *Erlich v. Glasner*, 418 F.2d 226, 228 (9th Cir.1969) (same).

**143.** Cpt. ¶ 158.

**144.** *See id.* ¶ 23. Rather, CIR was the "intended developer" of the prospective project

for the City-owned and Wantanabe sites, the City's rejection of which led to the prior federal court litigation brought by CIR in the Eastern District of New York. *See id.* The possibility that CIR might have come up with some other plan incorporating the Wantanabe site and the roller coaster is both too speculative and too remote a basis on which to proceed here. *See, e.g., Schonfeld v. Hilliard*, 218 F.3d 164, 172–75 (2d Cir.2000); *Silor v. Romero*, 868 F.2d 1419, 1422 (5th Cir.1989); *cf. Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 270 (11th Cir.1987). Indeed, the absence of any evidence (or even allegation) that CIR had an arrangement with Wantanabe for use of the roller coaster in some other plan requires the conclusion that CIR has failed to adduce evidence that the demolition of the roller coaster was an action with material adverse consequences for CIR. CIR therefore has not made out a *prima facie* case of retaliation against it.

the party injured ...."[145]

The existence of a conspiracy in violation of 42 U.S.C. § 1985 and consequent injury therefore are necessary, although not sufficient, conditions for a valid claim under Section 1986. To put it differently, Section 1986 "merely gives a remedy for misprision of a violation of 42 U.S.C. § 1985."[146] As there was neither a conspiracy in violation of Sections 1985(2) or (3) nor any resulting injury, the claim under Section 1986 must be dismissed.[147]

### E. The "Taking" Claim

■ Wantanabe's seventh claim for relief asserts that the demolition of the roller coaster constituted an uncompensated "taking" in violation of the Fourteenth Amendment.

■ A municipal demolition of an imminently dangerous structure in order to protect the public is an exercise of the police power and does not constitute a "taking."[148] Here, there is a genuine issue of fact material to the question whether the Thunderbolt constituted such a danger and, in consequence, whether its demolition was a proper exercise of the police power. Even if this issue were resolved in Wantanabe's favor, however, the "taking" claim would be premature.

As the Supreme Court held in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*,[149]

"[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation."[150] "[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation."[151]

New York permits actions against municipalities for injuries to property in circumstances precisely like those at issue here.[152] There is no suggestion that Wantanabe has brought such an action or been denied just compensation. Accordingly, its "taking" claim is not ripe for adjudication.

### F. The State Constitutional Claims

■ Wantanabe's eighth claim for relief asserts claims under the New York State Constitution's due process, equal protection and "taking" clauses. There is no suggestion that these state constitutional provisions are any more expansive, at least in any context relevant to this case, than their federal counterparts. Accordingly, the equal protection, "taking," and procedural due process claims are dismissed in their entirety, as is so much of the substantive due process claim as was dismissed as a matter of federal constitutional law.[153]

---

**145.** 42 U.S.C. § 1986.

**146.** *Williams v. St. Joseph Hosp.*, 629 F.2d 448, 452 (7th Cir.1980).

**147.** *See id.*

**148.** *E.g., Rochester Poster Adv. Co. v. City of Rochester*, 38 A.D.2d 679, 679, 327 N.Y.S.2d 249, 249 (4th Dept.1971); 11 EUGENE McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 32.27 (3d ed.2000).

**149.** 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

**150.** *Id.* at 194, 105 S.Ct. 3108.

**151.** *Id.* at 195, 105 S.Ct. 3108.

**152.** *See, e.g., Home Doc Corp.*, 297 A.D.2d 277, 746 N.Y.S.2d 42; *Calamusa*, 272 A.D.2d 426, 708 N.Y.S.2d 317.

**153.** Insofar as Wantanabe has made out a state substantive due process claim against Zeid and Hilton, it has done so as well against the City on a theory of *respondeat superior,* as New York does not apply *Monell* to constitutional torts by state and municipal employees.

## G. The Trespass Claim

Defendants seek dismissal of Wantanabe's ninth and final claim for relief, common law trespass, on the ground that their actions were justified as an exercise of the police power. For reasons previously indicated, there is a genuine issue of material fact as to whether the entry upon the land and the demolition were justified. The remaining question is which of the remaining defendants [154] arguably are responsible for any actionable trespass.

Mayor Giuliani authorized or approved it. Building Inspector Padmore recommended demolition. Borough Commissioner Zeid declared an emergency and ordered demolition. Chief Inspector Hilton concurred in that action. DOB Executive Chief Inspector Mineo passed on the papers necessary to the demolition. Assistant Commissioner Marchiano sent the papers to HPD, which would perform the demolition. HPD Assistant Commissioner Mustaciulo caused the demolition to be scheduled. Director of Demolitions McArdle gave NBI the notice to proceed. Accordingly, they all must remain defendants on this claim unless they enjoy official immunity, a matter discussed below. On the other hand, plaintiffs point to no evidence that defendants Babbar, Perine, Eskowitz and Peterson were responsible in any way for the alleged trespass. Accordingly, the eighth claim must be dismissed as to them.

## H. Immunity of the Individual Municipal Defendants

In view of the foregoing, what remains of the complaint are the (a) substantive due process claims against Zeid, Hilton, and the City, and (b) the common law trespass claim against the City, former Mayor Giuliani, Padmore, Zeid, Hilton, Mineo, Marchiano, Mustaciulo, and McArdle. All of the individual municipal defendants, however, seek dismissal on the grounds of immunity.

### 1. Federal Substantive Due Process Claim—Qualified Immunity

The Second Circuit recently has summarized the doctrine of qualified immunity applicable in Section 1983 cases as follows:

"Our analysis of a qualified immunity claim consists of a three step inquiry. First, we must determine whether plaintiff has alleged a violation of a constitutional right. Then we consider if the violated right was clearly established at the time of the conduct. Finally, if plaintiff had a clearly established, constitutionally protected right that was violated by the actions of the [defendant], he or she must demonstrate that defendants' actions were not objectively reasonable. This three step inquiry should typically be done in sequential order. Defendants may benefit from qualified immunity if plaintiff is unable to establish any of these three steps." [155]

The Court turns to a determination of whether Zeid and Hilton are entitled to qualified immunity on the surviving federal substantive due process claim.

It was clearly established at the time this allegedly occurred that "the exercise of power without any reasonable justification in the service of a legitimate govern-

See, e.g., *Brown v. State*, 89 N.Y.2d 172, 193–94, 652 N.Y.S.2d 223, 236, 674 N.E.2d 1129 (1996).

**154.** As noted, this claim has been dismissed as against NBI and Noto.

**155.** *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211–12 (2d Cir.2003).

mental objective"[156] violated the Due Process Clause. The Court already has concluded that a jury could find that these defendants issued and concurred in the Emergency Declaration, respectively, solely on the basis of Padmore's report that the structural steel members were rusted and dangerous, although they knew that Padmore was not qualified to make such a judgment. Were a jury to find the facts adversely to these defendants, their actions will have violated Wantanabe's clearly established constitutional rights. Nor would the jury be obliged to find, on this record, that their actions were objectively reasonable. Accordingly, they are not entitled to dismissal at this time on the basis of qualified immunity.

### 2. State Substantive Due Process Claim—State Law Official Immunity

 The outcome is somewhat different with respect to the state law substantive due process claim. "[W]hen official action involves the exercise of discretion, [a public official] is not liable for the injurious consequences of that action even if resulting from negligence or malice."[157] Zeid plainly exercised judgment and discretion in determining whether the evidence before him justified issuance of an Emergency Declaration. It is not so clear, however, that Hilton's function was any more than ministerial or routine.[158] Accordingly, Zeid is entitled to dismissal of the state law claims against him on the ground of

immunity but no such conclusion can be reached as to Hilton at this time.

### 3. State Trespass Claim—State Law Official Immunity

For reasons already expressed, all of the individual municipal defendants who otherwise might be liable for trespass, but who exercised discretion in the process, are entitled to dismissal. Former Mayor Giuliani, and Padmore did so in taking the actions ascribed to them. Accordingly, they are entitled to dismissal of the state law trespass claim. As this record does not foreclose the possibility that the actions of the remaining individual municipal defendants were ministerial or routine, dismissal as to those defendants on this ground would be premature.

### III

Insofar as defendants' motions (DI 44, 46) seek summary judgment dismissing the complaint as to Wantanabe, they are denied to the extent that they seek dismissal of:

1. The federal substantive due process claim against Zeid, Hilton, and the City,

2. The state substantive due process claim against Hilton and the City, and

3. The trespass claim against the City, Hilton, Mineo, Marchiano, Mustaciulo, and McArdle. They are granted in all other respects.

Insofar as they seek dismissal of the claims of CIR and Bullard, they are granted in all respects.

**156.** *Lewis,* 523 U.S. at 846, 118 S.Ct. 1708.

**157.** *Tango by Tango v. Tulevech,* 61 N.Y.2d 34, 40, 471 N.Y.S.2d 73, 76, 459 N.E.2d 182 (1983); *accord Mon v. City of New York,* 78 N.Y.2d 309, 313, 574 N.Y.S.2d 529, 531–32, 579 N.E.2d 689 (1991); *Rottkamp v. Young,*

21 A.D.2d 373, 375, 249 N.Y.S.2d 330, 333–34 (2d Dept.), *aff'd,* 15 N.Y.2d 831, 257 N.Y.S.2d 944, 205 N.E.2d 866 (1965)..

**158.** *See Mon,* 78 N.Y.2d at 313–14, 574 N.Y.S.2d at 532, 579 N.E.2d 689.

There remains a final matter. Rule 56(d) provides in substance that a court denying in part a motion for summary judgment, where practicable, shall "make an order specifying the facts that appear without substantial controversy," which "shall be deemed established, and the trial shall be conducted accordingly." In view of plaintiffs' failure to adduce any admissible evidence to support their claim of racial animus, an issue on which they would have the burden of proof at trial, the Court determines pursuant to Rule 56(d) that no such animus existed or played any role in the events at issue. The trial shall be conducted accordingly. In addition, the Court reserves the right to make additional determinations pursuant to Rule 56(d) in the event the parties cannot arrive at factual stipulations sufficient to limit the scope of the proof at trial to material issues genuinely in dispute, as the record before the Court demonstrates that the vast majority of pertinent facts actually are not disputed.

SO ORDERED.